Houston GOODSPEED, Plaintiff,

v.

Charles HARMAN, Sr., Defendant.

Sue Kendrick, Plaintiff,

v.

Charles Harman, Sr., Defendant.

John Kendrick, Plaintiff,

v.

Charles Harman, Sr., Defendant.

Don Timberlake, Plaintiff,

v.

Charles Harman, Sr., Defendant.

Amy Peavy Wood, Plaintiff,

v.

Charles Harman, Sr., Defendant.

Virginia Moore, Plaintiff,

v.

Charles Harman, Sr., Defendant.

Dave Richardson, Plaintiff,

v.

Charles Harman, Sr., Defendant.

Jay Stephenson, Plaintiff,

v.

Charles Harman, Sr., Defendant.

Nos. 3–97–CV–2681–BD through 3–97–
CV–2686–BD, 3–97–CV–2739–BD
and 3–97–CV–2740–BD.

United States District Court,
N.D. Texas,
Dallas Division.

March 11, 1999.

Michael J. Quilling, Quilling Selander Cummiskey Clutts & Lownds, Dallas, Texas, for plaintiffs.

Thomas S. Leatherbury, William D. Sims, Vinson & Elkins, Dallas, Texas, for defendants WFAA–TV and Robert Riggs.

Frank H. Jackson, Law Office of Frank Jackson, Dallas, Texas, for defendant Charles James Harman, Sr.

## MEMORANDUM OPINION AND ORDER

KAPLAN, United States Magistrate Judge.

Plaintiffs have sued Charles Harman, Sr. in separate actions under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1996, 18 U.S.C. § 2510, et seq. ("Title III").[1] A bench trial was held on January 19, 25 & 26, 1999. The Court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

### I.

The facts of this case are set forth at length in the report and recommendation of the magistrate judge in two related lawsuits. Carver Dan Peavy, et al. v. Charles Harman, et al., No. 3–96–CV–1506–R and Eugene Oliver, et al. v. WFAA–TV, Inc., et al., No. 3–96–CV–3436–L.[2] Succinctly stated, Charles Harman purchased a police scanner in December 1994 to monitor criminal activity in his neighborhood. The first time Harman used the scanner he inadvertently intercepted a signal from a cordless telephone being used by his neighbor, Dan Peavy. Harman overheard Peavy talking to another neighbor about filing a class-action lawsuit against him and his wife.[3] This piqued his interest and he continued to monitor Peavy's phone calls.

Harman was unsure whether it was legal to tape these conversations. He consulted the scanner manual and talked with representatives of the Dallas Police Department and the Dallas County District Attorney's Office. Harman claims he was told that he could intercept and record private telephone calls between Peavy and others. Based on those assurances, Harman listened to his scanner every day for the next ten months and taped about 10% of what he heard.[4]

The Peavys talked over the telephone to countless friends, family members, and business associates during this ten-month period. Eight of them have now sued Harman for damages under the federal wiretap statute. The Court previously ruled that Harman violated the statute and rejected his defenses. See ORDER, 11/13/98 at 3. Two issues remain: (1) whether plaintiffs were parties to one or more of the intercepted telephone conversations; and (2) the appropriate amount of damages. The Court will address each issue in turn.

### II.

■ Title III imposes criminal and civil liability upon any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Court has already determined that Harman acted consciously, as opposed to accidentally, to bring about the consequences of his actions. See

1. The cases were consolidated on January 20, 1998.

2. The Peavy and Oliver cases were also consolidated for pretrial purposes. The parties filed cross-motions for summary judgment which were referred to the magistrate judge for recommendation. A joint report and recommendation was issued on October 15, 1998.

3. Peavy and Harman have been involved in a number of petty disputes over the years. On one occasion, Peavy sued Harman because he refused to cut back vegetation on his property that obstructed Peavy's view of a lake. More recently, Harman complained to code enforcement officials after Peavy installed high intensity security lights around his house.

4. Harman testified that he continued to monitor Peavy's phone calls until October 13, 1995, but only taped one conversation after March 3, 1995.

*Peavy,* No. 3–96–CV–1506–R, Findings and Recommendation of the Magistrate Judge, 10/15/98 at ¶ V(A)(1). Therefore, he "intentionally" violated the statute.

■ Plaintiffs introduced transcripts of telephone conversations between themselves and Dan Peavy during their case-in-chief. (Plf.Exh.2–9). Each plaintiff testified that: (1) they listened to the tapes made by Harman; (2) they recognized their voice on the tapes; (3) the transcripts accurately reflected the contents of the tapes; and (4) they did not give anyone permission to record their conversations. Harman does not contest these facts. Plaintiffs therefore have proved that Harman intercepted their communications in violation of 18 U.S.C. § 2511(1)(a).

■ Plaintiffs further argue that Harman violated the disclosure prong of the statute. *See* 18 U.S.C. § 2511(1)(c). A communication is "disclosed" every time it is played to a third party who has not yet heard it. *Fultz v. Gilliam,* 942 F.2d 396, 402 (6th Cir.1991). However, a defendant "need not play the tapes or repeat the conversations to be liable." *Deal v. Spears,* 980 F.2d 1153, 1158 (8th Cir.1992). Title III prevents the disclosure of "any information concerning the substance, purport, or meaning of [the] communications." 18 U.S.C. § 2510(8). Therefore, even revealing the general nature of a communication or intimating its contents may constitute an actionable disclosure. *See Deal,* 980 F.2d at 1156.

■ Very little evidence was adduced at trial concerning the disclosure of these intercepted communications. Harman testified that he played part of a taped recorded conversation between Jay Stephenson and Dan Peavy when he met with a

reporter for WFAA–TV in December 1994. This clearly constitutes an intentional disclosure in violation of Title III. Harman also said that he gave copies of other tapes to the reporter and various law enforcement officials. However, there was no evidence that the tapes contained communications with any of the plaintiffs or that these parties even listened to the tapes.[5] The Court finds that only Jay Stephenson is entitled to damages for the disclosure of information obtained in violation of the wiretap statute.

### III.

A person whose wire, oral, or electronic communication is intentionally intercepted, disclosed, or used may file a civil action against the person or entity that violated the statute. 18 U.S.C. § 2520(a). Appropriate relief includes damages and reasonable attorney's fees. *Id.* § 2520(b). The Court may assess as damages "whichever is the greater of—

> (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

> (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000."

*Id.* § 2520(c)(2). Here, plaintiffs seek only statutory damages for the interception and disclosure of their communications.

### A.

The Court must first decide whether the award of statutory damages is mandatory once plaintiffs prove a violation of Title III. This is the rule in the Seventh Circuit. *See Rodgers v. Wood,* 910 F.2d 444, 448 (7th Cir.1990). At least one federal district court is in accord. *See Menda Biton*

---

5. There is summary judgment evidence in the *Peavy* and *Oliver* cases that Robert Riggs and P.J. Ward listened to the tapes provided by Harman. *Peavy,* No. 3–96–CV–1506–R (WFAA Exh. D at ¶ 36; WFAA Exh. F at ¶¶ 12 & 15). While sworn declarations are appropriate evidence in a summary judgment proceeding, they are pure hearsay in the context of a trial. Fed.R.Evid. 801(c); *Stokes v. City of Omaha,* 23 F.3d 1362, 1366 (8th Cir.1994). Plaintiff has made no attempt to show that Riggs or Ward were unavailable to testify. *See* Fed.R.Evid. 804(a); *Mutuelles Unies v. Kroll & Linstrom,* 957 F.2d 707, 713 (9th Cir.1992). Therefore, the Court may not consider their declarations for any purpose.

*v. Menda,* 812 F.Supp. 283, 284 (D.P.R. 1993). However, this Court disagrees with those decisions.

■■ Title III expressly provides that the Court *may* assess damages for a violation of the statute. 18 U.S.C. § 2520(c)(2). The use of the term "may" does not necessarily imply a grant of discretion if "indications of legislative intent to the contrary or ... obvious inferences from the structure and purpose of the statute" suggest otherwise. *Reynolds v. Spears,* 93 F.3d 428, 434 (8th Cir.1996), *citing United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 2149, 76 L.Ed.2d 236 (1983). However, Congress specifically replaced the word "shall" with the word "may" when it amended section 2520(c) in 1986. *Nalley v. Nalley,* 53 F.3d 649, 652 (4th Cir.1995). "When the wording of an amended statute differs in substance from the wording of the statute prior to amendment, we can only conclude that Congress intended the amended statute to have a different meaning." *Id., citing Muscogee (Creek) Nation v. Hodel,* 851 F.2d 1439, 1444 (D.C.Cir. 1988), *cert. denied,* 488 U.S. 1010, 109 S.Ct. 795, 102 L.Ed.2d 786 (1989); *see also Romano v. Terdik,* 939 F.Supp. 144, 147 (D.Conn.1996) (failure to explain change in language allows court to rely on natural meaning of the word "may"). In these circumstances, the plain meaning of the term should prevail "except in the rare case in which the literal application of the statute will provide a result demonstrably at odds with congressional intent." *Nalley,* 53 F.3d at 652, *citing United States v. Ron Pair Enterprises,* 489 U.S. 235, 242, 109 S.Ct. 1026, 1030–31, 103 L.Ed.2d 290 (1989). Every other federal court that has considered this issue has found that Title III does not constitute such an exception. *See Reynolds,* 93 F.3d at 434–35; *Nalley,* 53 F.3d at 651; *Romano,* 939 F.Supp. at 148; *Shaver v. Shaver,* 799 F.Supp. 576, 580 (E.D.N.C.1992). The Court finds these authorities persuasive and holds that the award of statutory damages under Title III is discretionary rather than mandatory.[6]

## B.

■ Next, the Court must decide what factors guide its discretion. Most courts have declined to award damages for *de minimis* violations of the wiretap statute. A variety of factors are relevant to this determination:

(1) the duration of the interception or the extent of the disclosure;

(2) the reason for the interception;

(3) whether the defendant reasonably believed that his actions were legal;

(4) whether the interceptions resulted in actual damages to the plaintiff;

(5) whether the defendant profited from the interception; and

(6) whether the defendant has already been punished in some other proceeding.

*See, e.g. Morford v. City of Omaha,* 98 F.3d 398, 401 (8th Cir.1996); *Reynolds,* 93 F.3d at 436; *Nalley,* 53 F.3d at 653–54; *Romano,* 939 F.Supp. at 150.[7]

■ The last three factors are not particularly relevant to this case. There is no evidence that Harman profited from his actions. Nor has he been punished in some other proceeding for the wiretap violations made the basis of this suit.[8] Final-

---

**6.** However, the Court's discretion is limited to awarding the full amount of statutory damages or no damages at all. *See Shaver,* 799 F.Supp. at 580 (statute does not allow the court to award damages in an amount between these two choices).

**7.** Some courts also consider the defendant's ability to pay an award of statutory damages. *See Nalley,* 53 F.3d at 653–54; *Shaver,* 799 F.Supp. at 580. While this may impact the collection of a judgment, it should not determine whether damages are awarded in the first instance. Therefore, the Court will not consider this factor.

**8.** Harman pled guilty to one count of unlawful interception and paid a $5,000 fine. *United States v. Harman,* No. 3–96–CR–272–D. However, that charge was based on an unrelated interception that did not involve any of the plaintiffs. *Cf. Reynolds,* 93 F.3d at 430 &

ly, the Court is not convinced that any of the plaintiffs suffered actual damages worthy of compensation. While they all expressed feelings of anger, embarrassment, and emotional distress, this testimony appeared largely rehearsed and was not particularly compelling.[9] The Court will therefore focus on the other three factors.

### 1.

The first inquiry is the reason for the interception. Harman maintains that he monitored Peavy's telephone calls and recorded these conversations out of fear for his safety. He relies on the tapes themselves as evidence of his concerns. Plaintiffs objected to the introduction of the tapes and filed a motion to suppress. The Court granted the motion at trial and now affirms this ruling.

### a.

An aggrieved person may file a motion to suppress the contents of a communication intercepted in violation of Title III. 18 U.S.C. § 2518(10)(a). The statute provides:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

*Id.* § 2515. The "contents" subject to suppression "include any information concerning the substance, purport, or meaning of [the] communication." *Id.* § 2510(8).

■ The Court previously recognized an "adjudicatory exception" to this exclusionary rule to enable the parties to prove their claims and affirmative defenses. *Peavy*, No. 3–96–CV–1506–R, FINDINGS AND RECOMMENDATION OF THE MAGISTRATE JUDGE, 10/15/98 at ¶ IV(A). *See also McQuade v. Michael Gassner Mechanical & Electrical Contractors, Inc.*, 587 F.Supp. 1183, 1190–91 (D.Conn.1984) ("Section 2515 was no more designed to keep defendants in lawsuits brought under § 2520 from defending the alleged violations of § 2511 than it was to keep the [g]overnment from prosecuting violators under § 2511."). Harman now wants to apply this exception to the issue of damages.

The position advanced by Harman would effectively swallow the rule. Those courts that have recognized an "adjudicatory exception" to the exclusionary rule in civil cases have limited its application to the issue of liability. *See Williams v. Poulos*, 11 F.3d 271, 286 (1st Cir.1993); *McQuade*, 587 F.Supp. at 1188. To extend this exception any further would render the rule meaningless. The Court refuses to construe the statute in such a manner. *See United States v. Campbell*, 49 F.3d 1079, 1086 (5th Cir.), *cert. denied*, 516 U.S. 874, 116 S.Ct. 201, 133 L.Ed.2d 135 (1995) (statute should be construed so as to give effect to every part thereof).

### b.

The evidence shows that Harman and Peavy had been involved in an acrimonious personal feud for more than ten years. It was in this context that Harman began to intercept Peavy's telephone calls. Harman admitted to Detective Kevin Navarro that he was "delighted" at the prospect of Peavy's downfall. Navarro, who spent more than a year and a half interacting with Harman on almost a daily basis, felt

n. 3 (defendant already held liable for $40,000 in damages in related case).

**9.** Dave Richardson also testified that he lost approximately $200,000 in business profits after he was linked to Peavy in a report broadcast by WFAA–TV. However, there was

no evidence that this report was based on information derived from intercepted telephone conversations between Richardson and Peavy. Moreover, the lost profits claimed by Richardson are speculative.

that Harman hated Peavy and wanted to "take him down."

■■■ The Court finds that Harman's animus toward Peavy outweighed any other concerns that may have influenced his actions. Spite between neighbors is not a legitimate reason to intercept private communications in violation of federal law. *See Peavy,* No. 3–96–CV–1506–R, FINDINGS AND RECOMMENDATION OF THE MAGISTRATE JUDGE, 10/15/98 at ¶ VII(A)(1)(a). *Cf. Reynolds,* 93 F.3d at 436 (defendant who believed that recent burglary of his store had been an "inside job" had legitimate business reason for intercepting employees' phone calls). This factor weighs heavily in favor of awarding statutory damages.

### 2.

The second factor is whether the defendant reasonably believed that his actions were legal. Harman maintains that he was repeatedly assured by law enforcement officials that he could intercept and tape cordless telephone conversations. He first spoke to Assistant District Attorney Bill Geyer. Harman testified that Geyer told him, "anything over the air is free" and its "just like listening to the radio." He said that District Attorney John Vance and Detective Linda Irwin gave him similar advice. According to Harman, Vance specifically told him to "keep taping."

Geyer, Vance, and Irwin also testified at trial. Geyer explained that he receives 15 to 25 telephone calls a day from private citizens. He did not recall the specific

details of his conversation with Harman, but said it was against office policy to give legal advice to members of the general public. Geyer testified that he probably would have referred Harman to the Dallas Police Department. He did not tell Harman that his actions were legal or encourage him to record the contents of private phone calls.[10]

Vance confirmed that his staff was prohibited from giving legal advice to the general public. Although he did not remember speaking with Harman over the telephone, Vance did recall a meeting in his office in January 1995. He said that Harman wanted to talk about the recent death of his son. Harman tried to play a tape at this meeting but had difficulty with the recorder. Vance testified that he never told Harman it was legal to intercept or tape cordless telephone calls. He specifically denied telling Harman to "keep taping."[11]

Linda Irwin said that she spoke with Harman on three or four occasions. During their first conversation, Harman told Irwin that he was intercepting cordless telephone calls and asked if he could record the communications. Irwin responded that it was legal to tape the calls *if* one of the parties consented.[12] She did not know that Harman was recording the phone calls without permission. When Irwin became aware of this fact, she advised Harman to speak to someone other than her about the legality of his actions.

The Court credits the testimony of these non-party witnesses and finds that Har-

---

10. Harman attempted to impeach Geyer with his prior testimony at a suppression hearing held in the Peavy criminal trial. At that hearing, Geyer testified that Harman *inquired* whether his actions were legal. However, this does not prove that Geyer *told* Harman he could intercept and record the contents of private telephone conversations.

11. Defendant sought leave to call Wilma Harman as a sur-rebuttal witness in order to dispute the substance of Vance's testimony. Wilma was identified as a fact witness prior to trial, and counsel represented that she

would testify during the defendant's case-in-chief. However, she was never called as a witness. Plaintiffs' rebuttal case did not raise any issue that was not fully anticipated by the defendant before he rested. Under these circumstances, the Court denied leave to call a sur-rebuttal witness.

12. Irwin acquired this information as a result of investigating cases involving telephone harassment and obscene phone calls. However, she was not familiar with the wiretap laws outside of this limited context.

man was never told that his actions were legal. Rather, Harman was so blinded by his animosity toward Peavy that he only heard what he wanted to. This conclusion is bolstered by the fact that Harman continued to intercept Peavy's phone calls even after he learned it was illegal. On March 3, 1995, Assistant District Attorney Mike Gillette advised Harman that "[i]f you are monitoring the phone call [sic] of your neighbors . . . that activity must, in my opinion, stop or to do otherwise violates federal law." (Plf.Exh.10). Assistant United States Attorney Philip Umphres gave similar advice on October 3, 1995. (Plf.Exh.11). Nevertheless, Harman continued to intercept private telephone conversations in violation of the federal wiretap laws until the FBI confiscated his police scanner on October 18, 1995.[13]

Harman should not be able to avoid damages simply because he subjectively *thought* his actions were legal. The evidence shows that no such advice was ever given by law enforcement authorities despite Harman's selective recollection to the contrary. This factor weighs in favor of a damage award.

### 3.

The third consideration is the duration of the interceptions. All the plaintiffs testified that they spoke with members of the Peavy household on a regular basis during the ten-month period that these interceptions occurred. However, the only evidence of specific conversations involving plaintiffs are contained in the transcripts. (Plf.Exh.2–9). Absent further proof, the Court is unable to conclude that Harman intercepted any communications other than those reflected in the transcripts introduced into evidence.

Harman recorded twelve conversations involving Jay Stephenson, four conversations involving Virginia Moore, three conversations involving Amy Peavy Wood, and two conversations involving Don Timberlake. The other plaintiffs were recorded one time each. Standing alone, the length of these interceptions provides no reasoned basis for distinguishing one case from another. The Court is unwilling to hold that a conversation lasting three minutes is entitled to less protection than one lasting five minutes, or that a certain number of conversations must be intercepted before damages are warranted. Consequently, each plaintiff is entitled to statutory damages.

### C.

The final issue is the amount of damages to be awarded. Title III authorizes the court to assess "statutory damages of whichever is the greater of $100 a day for each day of the violation or $10,000." 18 U.S.C. § 2520(c)(2)(B). Plaintiffs argue that the statute allows the recovery of $10,000 in damages for *each* conversation intercepted or disclosed.[14]

The Court disagrees with that interpretation. No federal court has ever awarded damages on that basis. See *Romano*, 939 F.Supp. at 150 (citing cases). Nor does Fifth Circuit precedent compel a different result. In *Steve Jackson Games, Inc. v. United States Secret Service*, 36 F.3d 457 (5th Cir.1994), the court stated that a successful plaintiff is entitled to "statutory

---

**13.** Harman testified that he met with FBI Agent Matt Chapman on March 15, 1995. According to Harman, Chapman said he could listen to telephone calls on his police scanner but not record them. Chapman acknowledged that he met with Harman but denied making any such statement. In fact, he told Harman that a new law prohibited the interception of cordless telephone communications. This is consistent with the advice given to Harman by Mike Gillette just twelve days earlier.

**14.** Plaintiffs also seek damages for the illegal "use" of certain conversations in violation of 18 U.S.C. § 2511(1)(d). (Plf. Trial Brief at 8–9). However, the Court has previously held that Harman did not violate this prong of the wiretap statute. See *Peavy*, No. 3–96–CV–1506–R, Findings and Recommendation of the Magistrate Judge, 10/15/98 at § V(C).

damages of *$10,000 per violation* or $100 per day of the violation, whichever is greater." *Id.* at 460 (emphasis added). Not only is this statement pure dicta, but it inaccurately paraphrases the statute. *See Romano,* 939 F.Supp. at 150 (rejecting this same argument). Title III only permits a plaintiff to recover the greater of $100 per day of the violation or $10,000. 18 U.S.C. § 2520(c)(2)(B). Here, no plaintiff can prove that their damages exceed $10,000 when calculated on a per diem basis. Therefore, damages are limited to that amount.

### CONCLUSION

The Court finds that Houston Goodspeed, Sue Kendrick, John Kendrick, Don Timberlake, Amy Peavy Wood, Virginia Moore, and Dave Richardson are entitled to damages in the amount of $10,000 each for the interception of their communications in violation of 18 U.S.C. § 2511(1)(a). Jay Stephenson is entitled to damages in the amount of $20,000 for the interception and disclosure of his communications in violation of 18 U.S.C. § 2511(1)(a) & (c). The Court will enter separate judgments in favor of each plaintiff and against Charles Harman, Sr.

Plaintiffs may file an application for costs and attorney's fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure by *March 25, 1999.*

SO ORDERED.